IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICTOR A. CHAPPALE,<br><br>             Petitioner,<br><br>vs.<br><br>DAVE DAVEY, Acting Warden, California State Prison-Corcoran,[1]<br><br>             Respondent. | No. 2:12-cv-00257-JKS<br><br>MEMORANDUM DECISION |

Victor A. Chappale, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Chappale is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at California State Prison, Corcoran. Respondent has answered, and Chappale has replied.

I.  BACKGROUND/PRIOR PROCEEDINGS

On February 2, 2009, Chappale was charged with penetration of the genital opening by a foreign object (counts 1, 3, 4, and 5), rape by force or threat (count 2), sodomy by force and violence (count 6), lewd and lascivious acts upon a child under the age of 14 (counts 7 and 8), lewd and lascivious acts upon a child under the age of 14 by use of force or violence (counts 9 and 10), and aggravated sexual assault of a child (count 11). The information further alleged as to all counts that Chappale committed a qualifying offense against multiple victims under California Penal Code § 667.61, that California's one strike law applied, that he had previously been convicted of a serious felony, and that he had served two prior prison terms. It was also

---

[1]   Dave Davey is substituted for Connie Gipson as Warden, California State Prison, Corcoran.  FED. R. CIV. P. 25(d).

alleged that the prosecution of counts 1 through 6 was timely pursuant to Penal Code § 803(f)(1), and the prosecution of counts 7 through 11 was timely pursuant to Penal Code § 801.1(a).

On direct appeal of his conviction, the California Court of Appeal recounted the following facts underlying the charges against Chappale:

> *Counts 1 to 6*
> When S.K. was about 13 years old, she was the foster child of [Chappale] and his then wife, J.S.  J.S. had four children, including D.C. and Jonathan L.  S.K. lived with them from 1993 to 1995.  During that time, [Chappale] repeatedly molested S.K.  He started out watching her shower, commenting on the size of her breasts and telling her she was sexy.  Then there were times she would wake up, her pajama bottoms would be removed and [Chappale's] hand or fist would be penetrating her.  She remembered two specific occasions when this occurred; once when she was sleeping on the floor in D.C.'s bedroom and another when she was sleeping in the boys' room.
> On another occasion, [Chappale] held her breasts, pulled down her pants, removed her underwear, put his penis inside her and ejaculated.  After that assault, S.K. ran away to live with her stepmother.  She had to return to [Chappale's] home because her stepmother could not care for her and she had nowhere else to go.  When she returned from her stepmother's home, [Chappale] held her against a dryer, removed her jeans and penetrated her with a broomstick.  He warned her not to think about leaving again.
> Another time, [Chappale] penetrated her with a Mickey's beer bottle.  He wanted to see how wide she opened.  He also forced her to orally copulate him.  Once, in the garage, [Chappale] held S.K. against the back of the car, pulled her pants down and anally penetrated her.  Every time [Chappale] had sex with S.K., he ejaculated.
> D.C. saw [Chappale] and S.K. having sex in [Chappale's] bedroom.  S.K. had gotten in trouble.  [Chappale] told the other children to go to bed, had S.K. come to his bedroom and they argued.  [Chappale] grabbed S.K.'s neck and hit her.  He slammed her against the wall and onto the bed, took off her clothes and raped her.
> In approximately 1995, J.S.'s mother, J.A., moved to Texas.  [Chappale] and the family made a summer trip to visit J.A., and S.K. eventually told J.A. (her foster grandmother) about the molestations.  J.A. did not say anything while the family was in Texas because she was afraid of what [Chappale] would do to the family.  After the family returned to California, J.S. was told about the molestations.  J.A. also called child protective services in California.
> Upon learning of the molestations, J.S. planned to pack the family's belongings and return to Texas.  While S.K. was packing, [Chappale] arrived at the home.  J.S. confronted [Chappale] but he denied the molestations.  He threatened S.K. and slapped her.  [Chappale] left the house.  S.K. ran away and ultimately ended up in Vallejo. [Chappale] called S.K.'s grandmother's home and made threats to the grandmother.  S.K. was approximately 15 years old when she left [Chappale's] house.

Law enforcement investigated the reported sexual abuse and tried to contact S.K. An officer left a voice mail message on S.K.'s grandmother's telephone. S.K. returned the call and left a message stating everything was all right. Law enforcement did not speak with her directly.

***Counts 7 and 8***

D.C. was born in June 1984. [Chappale] began molesting her in 1995 after S.K. ran away. When D.C. was approximately 12 or 13 years old, [Chappale] rubbed and squeezed her breasts. In 1996 or 1997, D.C. walked into [Chappale] and J.S.'s bedroom. [Chappale] was lying on the bed and asked D.C. to lie down with him. She laid down with her back to [Chappale]. She felt him move against her and rub his penis on her buttocks. He was erect and he ejaculated.

D.C. recalled five or six additional incidents of molestation. These incidents included defendant kissing her, fondling her and raping her. The last molestation occurred on her 13th birthday. [Chappale] offered to buy her a toy for her birthday if she would orally copulate him.

Eventually, D.C. told her uncle that [Chappale] had been molesting her and they told J.S. D.C. told J.S. she wanted to live with her grandmother in Texas because she was afraid of [Chappale]. D.C. explained she was afraid of [Chappale] because he used to beat her and the other children "all the time" and because of things he had done "on the streets."

J.S. took D.C. to the police station to report the molestations. Officer Nicholas Schwall briefly interviewed D.C. and determined it appeared [Chappale] had molested her. J.S. then called [Chappale] and asked him about molesting D.C. He denied it and claimed D.C. was lying. J.S. believed D.C. [Chappale] did not explicitly threaten J.S., but she felt he had threatened her. She wanted to get the children out of the house, but was afraid of [Chappale]. Because she was afraid [Chappale] would come back to the house and that he would be angry and do something to her or the children, J.S. requested the police accompany her home to get clothing for herself and the children. Accordingly, Officer Schwall requested the patrol post an officer at the residence. When they arrived at the home, [Chappale] was not there. It appeared he had left because some money and his clothing were gone. Police were not able to locate [Chappale]. J.S. went with D.C. to stay at a friend's house because she was afraid to stay in the home. As the years passed, J.S.'s fear of [Chappale] diminished.

Detective Barbara Mustard also interviewed D.C. Detective Mustard issued a "be-on-the-lookout" bulletin for [Chappale]. Mustard also learned of the prior allegation of sexual abuse against S.K. She was not able to contact S.K. either.

Approximately 10 days after the initial report to police, J.S. took D.C. back to the police station and told her to recant her statements about the molestations. J.S. told D.C. that [Chappale] had threatened to hurt her grandmother. D.C. was frightened by the threat. J.S. wanted to "undo" the complaint so she did not have to worry about "getting in trouble with [Chappale]." D.C. told Detective Mustard she had lied about being molested. She explained she had been caught smoking cigarettes. Mustard told J.S. the

3

recantation had "a lot of holes in it." D.C. and J.S. left the police station and did not have any further contact with the police.

J.S. and the children moved to Santa Maria. D.C. spoke to counselors about the molestation. In the fall of 1997, J.S. called her mother and asked her to come get the children and take them to Texas. J.S. told her [Chappale] had threatened to kill her and the children and she was afraid for their safety. In June 1998, J.S. also moved to Texas and did not return to California.

*Uncharged Acts of Sexual Misconduct*

In 1997, [Chappale] molested seven-year-old Jonathan L. Jonathan had misbehaved and [Chappale] disciplined and hit him. Jonathan went to his room and sat on his bed crying. [Chappale] came into the room, sat next to Jonathan, rubbing his back. He then removed Jonathan's pajama bottoms, pulled his underwear down and anally penetrated Jonathan. He then rubbed his penis over Jonathan's cheeks and lips. [Chappale] ordered Jonathan not to say anything. Jonathan was terrified of [Chappale] because he used to hit Jonathan. Jonathan did not tell anyone what had happened because he was too scared. He had been afraid of [Chappale] since he was approximately four or five years old. A few months after he was molested, Jonathan, his mother and siblings moved to Texas.

Defendant also assaulted J.S.'s younger sister, Kristi S. Kristi had known [Chappale] since she was around seven or eight years old. When Kristi was approximately 25 years old, [Chappale] offered to do some repair work on her car. [Chappale] drove Kristi to work and as she got out of the car he grabbed her butt and told her this was how she was going to pay for the work on the car. Approximately two weeks later, [Chappale] came to visit Kristi at her apartment. He followed her into the bedroom, threw her on the bed, and pried her legs open with his legs. He demanded sex from her and she refused. He kissed her neck and groped her chest. She could feel his erect penis through his clothes. Finally he stopped and warned her, "you are lucky I like you."

*Defense*

The defense sought to challenge the reliability and credibility of the complaining witnesses. A defense expert testified about false memory syndrome. He indicated the use of leading questions, repeated questioning, social conformity, family dysfunction, and personality disorders can contribute to the development of false memories. Moreover, he testified, repeating the falsity can make a teen eventually believe it is the truth.

As a teenager, Terry M. lived with the family on and off in 1993, and some periods in 1994 and 1995. He never saw any inappropriate sexual contact between defendant, S.K., D.C. or anyone else. He never heard any unusual noises, screaming or talking. He did not notice any signs of abuse.

[Chappale's] children from a prior relationship also spent time with the family in 1995 and 1996. The children did not see anything inappropriate between D.C. and

4

>[Chappale]. One child did not remember S.K. The other did not hear any noises, screaming, talking or doors opening or closing during the night.
>   Various inconsistencies in the reporting of the molestations were also explored. In 1996, during police interviews, D.C. had indicated she was molested by someone other than [Chappale]. In a second interview in 1997, D.C. said she had never been molested. During a police interview in 2007, S.K. claimed she had told her grandmother about being molested by [Chappale] only after her grandmother told her [Chappale] had tried to rape Kristi. In December 2008, J.A. told a district attorney's office investigator that she first suspected [Chappale] was molesting S.K. in 1992 or 1993. Kristi never told the police investigator that [Chappale] had touched her breasts. In January 2009, D.C. told an investigator she had gotten in trouble with [Chappale] when she was caught smoking as a teenager.

*People v. Chappale*, No. C062291, 2010 WL 5124956, at *1-4 (Cal. Ct. App. Dec. 16, 2010).

Following trial, a jury found Chappale guilty of counts 1 through 8 and also found true the special allegations associated with those counts. The jury was unable to reach a verdict on counts 9, 10, and 11. The court declared a mistrial as to those counts and they were dismissed by the prosecution's motion. Thereafter, in a bifurcated proceeding, the court found true the prior serious felony conviction and prior prison term allegations.

On June 16, 2009, the court sentenced Chappale to 6 full consecutive terms of 8 years for counts 1 through 6, doubled to 16 years for the prior strikes, and 15 years to life, doubled to 30 years, for counts 7 and 8. The court also imposed a 5-year enhancement for the prior serious felony and two 1-year enhancements for the prison priors. Chappale's total imprisonment term was therefore 60 years to life plus 103 years in state prison.

Through counsel, Chappale appealed his conviction, arguing that two of the offenses were time-barred, he was denied his right to present a defense and confront and cross-examine a witness against him, and the application of the one strike law to counts 7 and 8 violated the prohibition against *ex post facto* laws. *Chappale*, 2010 WL 5124956, at *5-7. On direct appeal of his conviction, the California Court of Appeal affirmed his judgment in an unpublished,

5

reasoned opinion issued on December 16, 2010.  *Id.* at *8.  Chappale petitioned for review to the California Supreme Court, which was summarily denied on February 23, 2011.

Chappale timely filed a Petition for a Writ of Habeas Corpus to this Court on October 15, 2011.

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Chappale raises the same claims he unsuccessfully raised before the state courts on direct appeal: 1) the trial court violated his right to confrontation when it refused to allow the defense to impeach his former wife with a letter she wrote to Chappale; 2) his prosecution for counts 7 and 8 were time-barred; and 3) application of the one strike law to counts 7 and 8 violated the protection against *ex post facto* laws because it required proof of conduct predating the enactment of that statute.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). If the last reasoned state court

decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). *Stanley v. Cullen*, 633 F.3d 852, 860 (9th Cir. 2011); *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011).

## IV. DISCUSSION

1. Confrontation Claim

Chappale first argues that the trial court violated his right to confrontation when it failed to allow the defense to impeach Chappale's former wife with a letter she wrote to Chappale which he claims is "probative as impeachment of her testimony." The Court of Appeal described the following facts underlying this claim:

> One component of the defense strategy was to challenge the credibility of the witnesses. During the trial, J.S. testified that when she was told [Chappale] was molesting D.C. she was afraid. She indicated she went to stay with a friend, because she was afraid to go home and afraid of [Chappale]. She later took D.C. back to the police station to recant her molestation claims, because she did not want to "get in trouble" with [Chappale]. She had a conversation with him in which she felt threatened. On cross-examination, she confirmed that she had been afraid of [Chappale]. When asked if she was still afraid of him, she testified, "Not as much." She acknowledged she had

spoken with [Chappale] on the phone in the "last few years." She also said she could not put a specific time frame on exactly when she became less afraid of him.

Following cross-examination, [Chappale] sought to use a letter written by J.S. to defendant in September 2005 to impeach her testimony that she had been afraid of [Chappale] in 1997. In the letter, J.S. wrote that she loved [Chappale], suggested she wanted to get back together with him and provided him information to contact her. The court excluded the evidence, finding a letter written in 2005 was not relevant to what J.S.'s feelings were in 1997. The court noted J.S.'s significantly different circumstances. In 2005, J.S. was no longer living in California, and had remarried. The court also noted J.S. had testified she was not as afraid as she had been in 1997.

After trial, [Chappale] made a motion for new trial. Among other claims, [Chappale] argued that the trial court abused its discretion in not permitting impeachment of J.S. with the 2005 letter. [Chappale] argued the credibility of J.S. was highly relevant in that J.S. had testified she was so afraid of [Chappale] after the molestation was reported to law enforcement that she fled to Santa Maria and then to Texas.[FN2] [Chappale] claimed the letter was relevant to establish J.S. was "obviously not afraid of [him] in the least." The court denied the motion for new trial.

> FN2. The motion also claims that J.S. testified she had not been in contact with the [Chappale] since 1997. A review of J.S.'s testimony reveals this claim is untrue. J.S. testified she had spoken on the phone with [Chappale]. She did not testify about other forms of contact.

*Chappale*, 2010 WL 5124956, at *5-6.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. CONST. amend. VI. It is well settled that, under the Sixth Amendment, an accused has the right to present witnesses, testimony and other evidence in his defense. *See Washington v. Texas*, 388 U.S. 14, 19 (1967). However, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). States have considerable latitude under the Constitution to establish rules excluding evidence from criminal trials. *Holmes v. S. Carolina*, 547 U.S. 319, 324 (2006). "Thus, a trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the

9

issues, or misleading the jury. The trial judge enjoys broad latitude in this regard, so long as the rulings are not arbitrary or disproportionate." *Menendez v. Terhune*, 422 F.3d 1012, 1033 (9th Cir. 2005) (citations omitted); *see Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (holding due process rights are not violated by exclusion of relevant evidence where probative value is outweighed by danger of prejudice or confusion).

Federal Rule of Evidence 403, the federal counterpart to California Evidence Code section 352, permits the exclusion of evidence if its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules. Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . ." *United States v. Abel,* 469 U.S. 45, 54 (1984); *see Boyd v. City and Cnty. of San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009). California employs a similar rule. *See People v. Harris*, 118 P.3d 545, 565 (Cal. 2005) ("We review for abuse of discretion a trial court's rulings on the admissibility of evidence.").

As an initial matter, to the extent that Chappale argues here that the trial court abused its discretion when it denied admission of the letter, such claim is not cognizable on habeas review. Although the Ninth Circuit has suggested that an abuse of discretion may also amount to a constitutional violation, *see Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc), the Supreme Court has never held that abuse of discretion is an appropriate basis for granting federal

habeas relief.[2]  Indeed, quite to the contrary, the Supreme Court has strongly suggested that, while abuse of discretion is an appropriate standard on direct review, in a federal habeas proceeding it is not.  *Renico v. Lett*, 559 U.S. 766, 772-73 (2010) ("It is not even whether it was an abuse of discretion for her to have done so–the applicable standard on direct review.  The question under the AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application of . . . clearly established Federal law." (quoting § 2254(d)(1))).

Nor can this Court find that the trial court's denial of Chappale's request to admit the letter was unreasonable or contrary to federal law.  As the appellate court concluded:

> [Chappale] has not established any error.  The court acted within its discretion in finding the letter did not impeach J.S.'s credibility.  J.S. testified that she was afraid of [Chappale] in 1997, when she was married to him and living with him and that this fear influenced some of her subsequent actions, including having D.C. recant her claims of molestation.  J.S. acknowledged she had contact with [Chappale] in the intervening years and that she had become less afraid of him.  Eight years later, when the letter was written, J.S. was remarried, living in another state and [Chappale] was in prison.  The September 2005 letter showed that in 2005, J.S. no longer appeared afraid of [Chappale].  This, however, did not contradict J.S.'s testimony about her fear of him in 1997.

*Chappale*, 2010 WL 5124956, at *6.

Because the proffered evidence did not contradict J.S.'s testimony and was therefore not relevant, Chappale cannot demonstrate that its exclusion violated his right to confrontation.  *See Wood v. Alaska*, 957 F.2d 1544, 1550 (9th Cir. 1992) (no constitutional violation where the

---

[2]  At one time, the Ninth Circuit viewed a state court ruling to be "objectively unreasonable" if it amounted to a clear error.  *Van Tran v. Lindsey*, 212 F.3d 1143, 1152-54 (9th Cir. 2000).  This is the test the Ninth Circuit uses in reviewing a trial court decision under the abuse of discretion standard.  *United States v. Ressam*, 679 F.3d 1069, 1086 (9th Cir. 2012) (en banc).  The Supreme Court noted *Van Tran's* statement of the test and expressly rejected it as inappropriate under the AEDPA.  *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (clear error standard is insufficiently deferential to state courts).

evidence excluded is not relevant). Accordingly, Chappale cannot prevail on his confrontation claim.

       2.      Time Bar Claim

Chappale next asserts that his prosecution for counts 7 and 8 was time-barred because "these counts were charged under the extended statute of limitations provided in Penal Code Section 801.1. However that statute was not enacted until after the expiration of the statute of limitations of the underlying offenses." The California Court of Appeal disagreed, concluding:

> In 1996, the statute of limitations for section 288 was six years. However, on January 1, 2001, before the six-year limitations period had expired, an amendment to former section 803, subdivision (h)(1) extended the limitations period from six years to 10 years. Former section 803, subdivision (h)(1) is now codified in section 801.1, subdivision (b). Effective January 1, 2006, before the 10-year statute of limitations under section 801.1, subdivision (b) expired, the Legislature amended section 801.1 and added subdivision (a). This subdivision provides that for certain sex offenses, including section 288, where the victim was under the age of 18 at the time of the offense, the prosecution may be commenced at any time prior to the victim's 28th birthday.
> D.C. was under 18 when the offenses were committed and she will turn 28 in June 2012. Generally, for purposes of timeliness, a felony prosecution is commenced when an information or indictment is filed, when a defendant is arraigned on a felony complaint, or when an arrest warrant or bench warrant is issued. Under the general rule, [Chappale's] arraignment on the felony complaint on September 4, 2008, commenced the prosecution. Under these amendments to sections 803 and 801.1, the prosecution of the charges was commenced well within the statutory limitations period.

*Chappale*, 2010 WL 5124956, at *5 (citations omitted).

As another federal Circuit Court has explained, "a state court's failure properly to apply a state statute of limitations does not violate due process or, indeed, any other provision of the Constitution or a federal statute." *Loeblein v. Dormire*, 229 F.3d 724, 726 (8th Cir. 2000). Thus, Chappale's claim, which contends only that the state court's interpretation of and application of its own statutes of limitation was erroneous, fails to state a cognizable federal habeas claim since the claim involves only a question of state law. *Estelle*, 502 U.S. at 67. And,

12

as previously mentioned, this Court is bound by the state court's interpretation of its own laws. *Oxborrow v. Eikenberry*, 877 F.2d 1395, 1399 (9th Cir. 1989).  The Court of Appeal discussed at length the reasons why Chappale has not established that the state courts misapplied California law.  *Chappale*, 2010 WL 5124956, at *5.  Accordingly, the Court is bound by that determination, and Chappale is not entitled to relief on this claim.

       3.    *Ex Post Facto* Claim

Finally, Chappale contends that the application of Penal Code § 667.61(e)(5) to counts 7 and 8 "violates constitutional and statutory provisions proh[ib]iting ex post facto laws because the predicate facts essential to establis[h]ing application of subdivision (e)(5) in this case required proof of conduct that predated enactment of Section 667.61."  The Court of Appeal rejected this claim on direct appeal, reasoning:

> Section 667.61, became effective on November 30, 1994.  It provides a defendant convicted of specified offenses against multiple victims in the same case shall be sentenced to 15 years to life.  The specified offenses include each of the offenses [Chappale] was convicted of in this case: forcible rape, forcible sexual penetration, forcible sodomy, and lewd and lascivious conduct on a child under the age of 14.
> Here, section 667.61 was applied only to counts 7 and 8.  The acts alleged in those counts took place in 1996 or 1997, long after section 667.61 became effective.  Counts 1 through 6, which were also qualifying offenses under section 667.61, were committed in 1993 through 1995 before the enactment of the one strike law.  Accordingly, there was no violation of the ex post facto clause.

*Chappale*, 2010 WL 5124956, at *7 (citations omitted).

The *Ex Post Facto* Clause prohibits retroactive punishment for acts which could not be punished at the time they were committed.  *Stogner v. California*, 539 U.S. 607, 610 (2003).  The Supreme Court and the Ninth Circuit have uniformly held, however, that recidivist statutes do not violate the *Ex Post Facto* Clause if they are "on the books at the time" the later offense was committed.  *United States v. Kaluna*, 192 F.3d 1188, 1199 (9th Cir. 1999) (en banc) (federal

Three Strikes Law did not violate the *Ex Post Facto* Clause because it was "on the books" at the time defendant committed the instant offense); *United States v. Ahumada-Avalos*, 875 F.2d 681, 683-84 (9th Cir. 1989) (per curiam) (although sentence imposed for drug conviction was statutorily enhanced because of a prior conviction that occurred before enactment of the enhancement statute, enhancement statute did not violate the *Ex Post Facto* Clause); *see also Nichols v. United States*, 511 U.S. 738, 747 (1994) (explaining that recidivist statutes do not change the penalty imposed for the earlier conviction because they "penaliz[e] only the last offense committed by the defendant" (citation omitted)); *People v. Alvarez*, 122 Cal. Rptr. 2d 859, 865 (Cal. Ct. App. 2002) (analogizing to the Three Strikes Law and finding no state or federal constitutional violation of the *Ex Post Facto* Clause because California Penal Code § 667.61 does not require that the earlier crimes have been subject to the One Strike Law when they were committed and the law was applied only to the crime that occurred after the date of the One Strike law).

In this case, as the appellate court noted, Chappale committed the offense against D.C. in 1996 or 1997, well after the effective date of the One Strike Law. *Chappale*, 2010 WL 5124956, at *7. Thus, as further noted by the appellate court, the use of pre-1994 incidents to enhance Chappale's current sentence does not violate the *Ex Post Facto* Clause. Accordingly, the California court's rejection of Chappale's claim did not contravene or unreasonably apply federal law, and Chappale is not entitled to relief on his *ex post facto* claim.

V. CONCLUSION AND ORDER

Chappale is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a certificate of appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: September 2, 2014.

                                      /s/James K. Singleton, Jr.
                                      JAMES K. SINGLETON, JR.
                                      Senior United States District Judge